# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| **CYNTHIA D. MARTIN, ET AL.,** | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 5:05CV00028 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MERCK & CO., INC.,** | ) | By: James P. Jones |
| | ) | Chief United States District Judge |
| Defendant. | ) | |
| | ) | |

*Mark B. Frost and Michael C. Ksiazek, Frost & Zeff, Philadelphia, Pennsylvania, and Timothy E. Cupp, Cupp & Cupp, P.C., Harrisonburg, Virginia, for Plaintiffs; Robert J. Smith, Charles P. Groppe, and Joyce E. Taber, Morgan, Lewis & Bockius LLP, Washington, D.C., and F. Vellines, Jr., Vellines, Cobbs, Goodwin & Glass, PLC, Staunton, Virginia, for Defendant.*

In this employment discrimination case, the plaintiffs allege that they were subjected by their employer to a hostile work environment, disparate treatment, and retaliation in violation of Title VII[1] and § 1981.[2] The defendant employer has moved for summary judgment. Based on a careful review of the record, I find that the plaintiffs cannot meet their burden of proof and will thus grant summary judgment in favor of the defendant.

---

[1] 42 U.S.C.A. §§ 2000e to 2000e-17 (West 2003).

[2] 42 U.S.C.A. § 1981 (West 2003).

The plaintiffs, Cynthia D. Martin, Marcella R. Tams, and James E. Thomas, were all employed by Merck & Co., Inc. ("Merck") in its pharmaceutical manufacturing plant in Elkton, Virginia, known as the Stonewall plant.[3]  Merck has employed Tams and Thomas since 1979 and Martin since 1981.  They allege that Merck violated their rights under Title VII of the Civil Rights Act of 1964 and 42 U.S.C.A. § 1981 by subjecting them to a hostile work environment, disparate treatment, and retaliation, all on account of their race as African-Americans.[4]  Martin and Thomas continue to work at the plant to this day, but Tams left Merck in 2003 on long-term disability.

The plaintiffs filed identical complaints with the Equal Employment Opportunity Commission ("EEOC") in 2000.  The EEOC issued right-to-sue letters on September 4, 2001.  The present action was initially filed by the plaintiffs individually and on behalf of all other similarly-situated Merck employees on December 3, 2001, in the United States District Court for the Eastern District of

---

[3]   Steven C. Lee was originally an additional plaintiff in this action, but was voluntarily dismissed.

[4]  Initially the plaintiffs also alleged violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d (West 2003), but plaintiffs abandoned those claims in their Amended Complaint.

Pennsylvania. That court denied class certification. Thereafter, the defendant moved to transfer venue to this court. The motion to transfer venue was not opposed and the case was transferred on May 21, 2005.

The defendant filed a Motion for Judgment on the Pleadings, which I denied on November 3, 2005. Following discovery, I granted leave to file an Amended Complaint setting out additional factual allegations relating to the individual plaintiffs. Meanwhile, the defendant filed separate Motions for Summary Judgment as to each individual plaintiff. In the alternative, the defendant requested that the plaintiffs' cases be severed should their claims survive summary judgment. The parties have briefed the issues and the Motions for Summary Judgment are ripe for decision.[5]

## II

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burdens of proof at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see* Fed. R. Civ. P. 56(c). In determining whether the

---

[5] None of the parties have requested oral argument, and the facts and legal contentions are adequately presented in the materials before the court. Because I grant the Motions for Summary Judgment, it is not necessary for me to rule on the alternative relief requested.

Case 5:05-cv-00028-JPJ   Document 78   Filed 08/28/06   Page 3 of 57   Pageid#: 1262

moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

"Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Id*. at 327. With this standard in mind, I will now address each of the plaintiffs' claims in turn.

## A

The plaintiffs allege that Merck has subjected them to a hostile work environment, in violation of Title VII and § 1981. The elements of this claim are the same under either § 1981 or Title VII. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). To prevail on their claim of a racially hostile work environment, the plaintiffs must show that the harassment was (1) unwelcome, (2) based on race, (3) sufficiently severe or pervasive to alter the conditions of

employment and create an abusive atmosphere, and (4) that there is some basis for imposing liability on the employer. *See id.* at 183-84. The facts set forth in support of this claim, recited in the light most favorable to the plaintiffs, are as follows.

The instances allegedly creating a hostile work environment at Merck's Stonewall plant range in date from 1980 to 2005. While the plaintiffs cite thirty-eight separate objectionable occurrences, only certain of the allegations implicate racial animus. In the early 1980s, an unidentified white employee called Martin a "nigger." Martin complained to defendant management requesting that something be done to remedy the situation, and in response management told the white employee to stay away from Martin. Also in the 1980s, Tams asked at an affirmative action meeting whether there had ever been a black female supervisor at the Stonewall plant, and Sherry Dean, another operator at Stonewall, stood up and stated that there never had been and never would be.

In the 1990s, Mike Brandt, a mechanical supervisor at the Stonewall plant, used the word "nigger" in front of plaintiff Thomas, but Thomas never reported the incident because Brandt apologized and asked Thomas to keep quiet because he feared that it would cost him his job. Also in the 1990s, John Burford, a mechanic at the Stonewall plant, commented to other mechanics in plaintiff Tams' presence that

- 5 -

blacks were not good at operating the machinery, but Tams' never reported this incident.

In August of 2000, Chuck Morris, the vice president of the local union at the plant, was talking with several other white employees without realizing that a walkie-talkie was on. He used the word "nigger" several times during the conversation. This conversation was picked up by and broadcast through the open walkie-talkie to anyone else who had a walkie-talkie keyed to the same frequency. Martin claims that Kenny Miller, then the union president, stated to her that this incident was "no big deal" and the offender had used the word "nigger" before. The incident was reported to Merck, and as a result, Morris received a five-day suspension. None of the three plaintiffs heard the transmission in question, nor do they recall whether they were at work that particular day.

In response to the Morris incident, Merck hired an attorney to conduct sensitivity training for employees at the Stonewall plant, but in the course of that training the attorney himself used the word "nigger." As a result, the attorney was not well received, the training was discontinued, and no subsequent sensitivity training was rescheduled.

In 2000, Angela Hopkins, a black employee, found a racially offensive Dilbert cartoon posted on a bulletin board. This incident was reported, but the responsible party was never identified and no disciplinary action was taken.

That same year, someone defaced an Energizer Bunny toy belonging to a black employee in building number one of the Stonewall plant to read "Nigger" rather than "Energizer." At the time in question all three plaintiffs worked in building five and never saw the defaced toy firsthand, but all three were aware of the incident. It was brought to Merck's attention, but the responsible party was never identified and no disciplinary action was taken. Also in or about 2000, the plaintiff Thomas witnessed Robin Murkee, a white employee, holding a hangman's noose up to Alex Mendez, a Hispanic employee, and telling Mendez to come over and see if it fit. When Thomas question Murkee about the noose, Murkee laughed.

In 2001, Cathy Dalrymple, a white employee, made racially offensive comments regarding Bernard Fauntleroy, a black employee. Specifically, Dalrymple mocked Fauntleroy's clothing and the food he ate, stated that Fauntleroy needed to "go back to the jungle where he came from," and made the comment "you know how these people shed." (Martin Dep. 157; McNeal Dep. 146.) Martin heard about this incident and reported it to Merck and Dalrymple was ultimately terminated because of these comments.

- 7 -

In 2002, Tams was verbally harassed and insulted in the locker room by white female Merck employees Terry Powell and Angela Eppard because of her race. Powell and Eppard taunted Tams as she was changing in the locker room, saying that she had an unpleasant odor because she was a black woman and also making fun of her hair, weight, appearance, and size of her buttocks. Tams endured this harassment for approximately a month, and then complained to management. Tams had a meeting with supervisor David Seacrist and human resources employee Leslie Gill to recount the situation, and another meeting with them in which Tams was advised that the situation had been investigated and taken care of. Powell and Eppard were initially issued five-day suspensions, the most severe discipline short of termination under the collective bargaining agreement, but the punishments were later reduced to one-day suspensions because of a grievance by the union. Tams alleges that because she reported this harassment, she subsequently experienced hostility from other employees in the locker room. In particular, she claims that other employees would walk out of the locker room and break room whenever she walked in.

In 2002, Tams found an auction notice in a local newspaper in which Butch Wade, a manager at the Stonewall plant, was auctioning off Ku Klux Klan items along with Merck magazines. At the time Tams did not know Wade was a Merck employee, but assumed he was because the ad referenced Merck magazines dating

- 8 -

back to 1949. Tams never reported her suspicions to Merck. All three of the plaintiffs saw the ad, but they never saw it nor any reference to it at the Stonewall plant.

On another occasion, Gary Shiflett, an employee in building five and a Civil War buff, showed Thomas Ku Klux Klan material on the internet. Shiflett frequently showed Thomas coins, medals, bullets, and other assorted Civil War memorabilia on the internet, but this was the only time he showed him anything related to the Ku Klux Klan. Shiflett told Thomas, "I don't believe in it or anything like that, it's just memorabilia." (Thomas Dep. 178.) Thomas never reported this incident to anyone at Merck. The plaintiffs also allege that Reba Breeden, another worker in building five at the Stonewall plant, is rumored to have ties to the Ku Klux Klan.

In addition to these incidents implicating racial issues on their face, each plaintiff also points to several other occurrences at the Stonewall plant which they claim were the result of racial animus and contributed to a hostile work environment. Many of these allegations are also cited in support of the plaintiffs' respective disparate treatment and retaliation claims.

Martin claims that in or about 1996, someone went into her personal locker and put chocolate all over her clothes and also shredded a magazine that she had left in the break room. Martin complained about these incidents but nothing was ever done.

Martin argues that chocolate denotes racial impetus, and that because the two incidents happened with in the same time frame, it can be inferred that both instances were based on her race.

Martin also makes several objections regarding her scheduling and job assignments. While employed as an operator in building seven of the plant in the mid-1990s, she was prevented from working flexible hours although several white employees had previously worked flexible hours and she herself had been working flexible hours for the previous four years. Martin filed a charge with the National Labor Relations Board, and as a result she was permitted to work flexible hours on weekends only.

Martin takes issue with the fact that in 2001, while working as a relief operator in building five, she was no longer permitted to work a straight daylight shift and was instead given the choice between a rotating shift or a newly-created third shift. Martin chose the third shift, but filed a grievance and contended that a white employee with less seniority, Nolan Dean, was permitted to remain in the same position working straight daylight hours. Dean was trained in blending, an area frequently requiring relief operators during daylight hours. Martin complains that she was not permitted to train in blending. After Martin had transferred to the third shift

- 10 -

and filed the present lawsuit, she noticed that the word "lawsuit" was written next to her name on her supervisor Brian Overkott's employee list.

Martin also argues that she was improperly disciplined for absences. In 2002, Merck instituted a computer program called the Absence Monitoring System ("AMS") to track employees' absences. Under AMS, employees were subjected to progressively severe discipline for absences. The first unexcused absence resulted in counseling, the second a verbal warning, the third a written warning, the fourth a one-day suspension, the fifth a three-day suspension, the sixth a five-day suspension, and thereafter discharge. At the beginning of each new year, employees would fall back two steps on the discipline ladder. In or about July of 2003, AMS experienced technical difficulties and failed to track absences of ten to fifteen employees for approximately fifteen months. When the problem was fixed in November 2004, AMS revealed that Martin had several unexcused absences. As a result, Merck gave Martin a five-day suspension, which is the level on the discipline ladder that Martin would have progressed to had the computer glitch not occurred.

Martin complained to her supervisor, Craig Kennedy, that this was unfair because the last discipline she received was a verbal warning in July 2003, she had no way of knowing where she stood on the discipline ladder during the time AMS was malfunctioning, and she had never received her two-step drop down at the

beginning of 2004.  Kennedy offered to give Martin a written warning even though her absences warranted a five-day suspension, but Martin rejected the offer on principle saying that the glitch was not her fault.  Ultimately Kennedy gave Martin a three-day suspension, but Martin again complained that this was arbitrary.

Two months later, in January of 2005, Martin missed another day and received a one-day suspension as a result.  Martin filed a grievance, taking issue with the previous three-day suspension and with the new one-day suspension on the ground that it should have been a written warning under the discipline ladder system.  Martin had union assistance in the grievance process.  Merck made a settlement offer whereby it would rescind the suspensions and repay her for the four days, but Martin rejected the offer because it contained a clause stating that the agreement could not serve as precedent for any future dispute between the union and Merck.  Martin contends that this attendance issue was the result of racial animus and that Craig Kennedy has a "vendetta" against her.  (Martin Dep. 263.)

Next, Martin alleges that she was harassed by Merck's health services and human resources.  Prior to rotator cuff surgery that Martin had in October of 2003, her doctors indicated that she could not work, but Merck contacted two of Martin's doctors directly, asking if Martin could return to work before surgery for a light duty training assignment.  Martin complained to Merck's ombudsman's office, which

- 12 -

conducted an investigation. Ultimately, the ombudsman's office concluded that "the contacts from health services were necessary in order to adequately manage the absence . . . [and] Ms. Martin was not treated differently because the number of contacts was similar to those made to other employees." (Def. Mot. Summ. J. Martin Ex. 2.)

Martin also contends that, after her rotator cuff surgery, Merck harassed her regarding documentation supporting her entitlement to short-term disability benefits and leave under the Family Medical Leave Act. Martin particularly takes issue with the fact that her doctors were again contacted directly and asked to provide confidential information. She also notes another time when she was out on short-term disability for depression and Merck sent a letter to her physician requesting that Martin return to work prior to the expiration of the four-week period the doctor had previously recommended. Martin complained to Leslie Gill in the human resources department about this alleged harassment.

Martin alleges that she was harassed by Merck regarding her work restrictions following surgery. Generally, Merck employees with work restriction have those restrictions evaluated once per year, but Merck requested that Martin have her restrictions evaluated before a year had expired. Martin also states that her

- 13 -

supervisor, Marissa Breeden, required her to perform work prohibited by her restrictions.

Lastly, Martin contends that her job was improperly reposted while she was on sick leave for the surgery. Specifically, she claims that her job was reposted during her short absence and given to Willie Lam, a white male, in contravention of company policy providing that an employee must be out for six months before her job can be reposted. Despite Martin's allegation, the record is clear that Martin returned to her position on third shift when she returned from surgery. Nonetheless, Martin complained about this incident to Merck's ethics committee.

The plaintiff Thomas takes issue with numerous other occurrences at Merck. Thomas argues that he was improperly deprived of overtime opportunities. At Merck, overtime is awarded based on the number of overtime hours an employee has already worked, such that overtime opportunities are first given to the employees with the lowest number of accrued overtime hours. In or about 1997, Thomas had a low number of overtime hours as a result of having recently returned from being out on sick leave. Several other employees, who were white, thought it unfair that Thomas should be awarded overtime hours as a result of being out sick and requested that management average Thomas' hours in with the other employees to avoid this result. Merck agreed to this request and averaged in Thomas' hours despite the fact that the

- 14 -

collective bargaining agreement provided that this should not be done. Thomas filed a grievance with the union that proceeded to the second step in the grievance process, but the union advised Thomas not to challenge Merck's decision and Thomas dropped the matter.

Next, Thomas contends that he was denied funeral leave for the death of a non-family member while white employees were granted funeral leave under similar circumstances. Thomas and Martin have been in a romantic relationship for sixteen years, and when Martin's father passed away in 1996, Thomas requested leave to attend the funeral service. Merck management approved the leave, but when Thomas returned he was not paid for the time he took off. Thomas brought this to management's attention, noting that white employees had been given leave to attend the funerals of non-family members, and Thomas was ultimately reimbursed.

Thomas also complains that he was discriminated against when he was not permitted to work in the "filling room" because he had not completed the required "sterile room challenges." In or about 2002, the defendant began enforcing a policy by which employees had to complete two sterile room challenges per year in order to work in the filling room. Merck states that this new policy was implemented after it received a citation from the government for failuring to require all employees in relevant departments to participate in at least one sterile challenge per year, but

Thomas contends instead that it was not truly a new policy but rather an excuse to discriminate against him on the basis of his race.

Thomas worked in the filling room in building five and missed sterile challenges in July and December 2002 while out on short term disability leave. Thomas alleges that he asked management if he could come in while on sick leave to perform the sterile challenge but such request was denied. When Thomas returned to work he was not permitted to perform the filling room job from March 2003 until July 2003, when he participated in the next available sterile challenge. Thomas argues that he lost overtime opportunities during this period as a result of being excluded from the filling room, but it is undisputed that Thomas could have worked overtime on the line but chose not to put himself on that list.

Thomas argues that his exclusion from the filling room was discriminatory because in prior years white employees had been allowed to continue working in the filling room despite missing sterile room challenges. While Thomas states that he does not believe this was truly a new policy initiated in 2002, he admits that since 2002 no other employee that has missed the required challenges has been allowed in the filling room. Thomas also complains that after 2002 two trainees who had not completed the sterile challenge were allowed to enter the filling room, and that David Hunter, the department head in building five, also went into the filling room after

- 16 -

2002 without completing a sterile challenge.  Thomas filed a grievance with Merck and a charge of discrimination with the EEOC regarding this sterile challenge situation.

Thomas alleges that he was denied training because of his race.  In or about 2003, Thomas asked to be trained on the "component prep" side of building five, but Merck denied Thomas this opportunity.  According to Thomas, whenever white employees asked to be trained, they were "trained in a heartbeat."  (Thomas Dep. 91-92.)  In support of this contention Thomas notes a time in or about 2006 when a white male employee's request to be trained in the warehouse was granted "right away."  (*Id*. at 92.)

In another allegation of discrimination, Thomas claims that he was harassed by his supervisor, Ted Thomas.  The plaintiff Thomas points specifically to one occasion in or about 2003 when Ted Thomas came into the break room and made Thomas go back to work while allowing other white employees to remain on break.  Thomas complained to Ted Thomas and asked why he had been singled out, but Ted Thomas simply replied "don't get into this."  (Thomas Dep. 169.)  Thomas also takes note of a written warning that Ted Thomas gave him in or about October 2005 for having his safety goggles on top of his head rather than on his face.  Ted Thomas never personally saw Thomas with his goggles on top of his head, but rather another

employee reported the situation to him. While it is undisputed that it was improper for employees to wear their goggles in this way, Thomas states that around the same time he received the written warning, two unidentified white male mechanics had also worn their goggles on their heads but received merely verbal warnings.

Lastly, Thomas claims that he was harassed by Merck's health services and human resources. According to Thomas, he provided health services with the appropriate documentation when he was out on sick leave in or about 2002, but health services nonetheless alleged that he had failed to turn in a doctor's note and threatened to dock his pay for the time he was out. Thomas also received three letters from the human resources department regarding this matter. Eventually Thomas' attorney re-sent the doctor's note, and the matter was resolved. Thomas contends that he was again harassed in or about 2004 in connection with his short term disability leave. Thomas' physician originally provided that Thomas would return from this leave on November 1, 2004, but Thomas did not return until November 10, 2004. Subsequently, his physician sent a note to Merck revising the return-to-work date to November 8, 2004. Merck unilaterally contacted Thomas' physician requesting addition information regarding the new return-to-work date, but Thomas' doctor refused to provide this information without a medical release. Merck then wrote Thomas a letter requesting the same information and threatening to dock his

pay should he fail to provide it. Because Thomas never provided the requested information, he was not paid for the additional missed days.

The additional occurrences that plaintiff Tams alleges contributed to a hostile work environment are as follows. First, Tams argues that she was harassed and discriminated against regarding her work restrictions. After back surgery in 1983, Tam's physician imposed permanent work restrictions. Tams notes that, as a result of these restrictions, employees would comment that she had "gravy jobs" and imply that she should not be working. (Tams Dep. 66.) She claims that white employees with similar restrictions did not receive similar comments from coworkers. In or about 1990, Tams had shoulder surgery. While her physician approved her return to work shortly thereafter, plaintiff states that Merck would not allow her to return because of her prior restrictions. Tams was eventually permitted to return to work in January of 1992. Arguing that white employees with similar restriction were permitted to work, Tams filed a charge of discrimination with the EEOC and eventually filed a lawsuit, separate from the one at hand, against Merck for this incident.

Tams alleges that in 1994 she was denied the opportunity to train on a piece of machinery called a "thermo former" because of her race. The thermo former was a new piece of equipment brought in from Germany, and, according to Tams, she was

- 19 -

the only employee available in building five to be trained on the machine. Rather than choosing to train Tams, however, supervisor Frank Sprinkle called Bert Fiddler, a white employee, and asked him to cancel his vacation in order to train on the thermo former. It was only after Fidler refused that Sprinkle allowed Tams to train on the new machine. Tams also complains that on one occasion in the 1990s, one of Merck's mechanics, John Buford, commented to other mechanics in Tams' presence that African-Americans were not good at operating the machinery.

Tams next alleges that Derek Payne, an African-American lab technician with a masters degree in chemistry, applied for a promotion twenty-one times and was denied every time. According to Tams, the most recent time Payne was denied promotion, the position was given to a white employee whose father had been a long-standing Merck mechanic.

Tams complains of two incidents in 2003, following the harassment she endured from Terry Powell and Angela Eppard, that contributed to a hostile work environment. First, the buttons were cut off of her uniform pants. Each employee at Merck who does not work in a sterile environment wears a standard blue, shirt-and-pants uniform monogrammed with the employee's name. These uniforms are kept in lockers, and employees change into their uniforms when they arrive at the plant for work. Tams alleges that someone went into her personal locker and snipped the

- 20 -

buttons off of all six pairs of her uniform pants. Tams never reported this incident to human resources, but her supervisor was present when Tams first realized her buttons were removed. The second incident complained of is that Tams left her lunch in a bag with her name on it in the break room refrigerator and someone allegedly threw it away. Tams argues that these incidents occurred in connection with the racial harassment she experienced from employees Powell and Eppard and were thus based on race. In support of this contention Tams notes that these incidents occurred after the harassment and contemporaneous with the alleged retaliatory treatment she received from the other employees.

Tams also argues that Merck improperly refused to return her to her operator position on the packaging line in building five after sick leave. Tams had worked in this position for approximately twenty-five years, but upon returning to work after sick leave in 2001, she was not permitted to continue in the same job. Because of certain work restrictions imposed by her doctor, building five was one of the few areas in which Tams could work and it took Merck some time to find another suitable position. Tams argues that under the collective bargaining agreement, Merck should have accommodated Tams by permitting her to take the spot of a less senior employee on the packaging line. Merck did not do so, but Tams remained doing different jobs as needed. Tams claims that Merck has more appropriately accommodated white

- 21 -

employees under similar circumstances, and thus complained to production supervisor David Seacrist, human resources employee Leslie Gill, director of human resources Diane McNeal, manager Bill Conklin, and plant manager Don Kremer about the matter. Tams was eventually put back in the packaging line position when Charlotte Chittum, a white operator on the packaging line, informed Merck that she would not be returning to work after having been out on disability.

Lastly, Tams complains that in or about 2000 or 2001, Doug Lewis, a black employee in building five, had a blockage in his leg and thus had work restrictions imposed by his doctor prohibiting him from doing jobs that required him to stand. According to Tams, who was informed of the situation by Lewis personally, Merck told Lewis that they would find a job that he could perform but never followed through on the promise. Lewis would call in periodically to inquire as to whether the defendant had found a suitable job, but he eventually retired in 2002 or 2003 after never having being accommodated.

As an initial matter, the defendant argues that several of the plaintiffs allegations offered in support of the hostile work environment claim are time barred under both § 1981 and Title VII, and further that the Title VII hostile work environment claim exceeds the scope of the EEOC complaint. First, with regard to the timeliness argument, § 1981 has a four-year statute of limitations, *see Jones v.*

*R.R. Donnelley & Sons Co.*, 541 U.S. 369, 375 (2004), and Title VII has an even shorter limitations period, *see Lewis v. Xerox Corp.*, No. 95C7013, 1998 U.S. Dist. LEXIS 4403, at *13, *13 (N.D. Ill. Mar. 31, 1989) ("Title VII has a considerably shorter limitations period than § 1981."). The plaintiffs filed the present action on December 3, 2001, and thus a number of their allegations of hostile work environment, some dating back as far as the 1980s, would fall outside the limitations periods applicable to claims under § 1981 and Title VII. Nonetheless, while the plaintiffs' allegations of unlawful employment practices extend beyond the critical limitations dates, the plaintiffs' hostile work environment claim alleges continuous discrimination rather than any single discriminatory act. Therefore, the limitations periods for § 1981 and Title VII claims do not bar me from considering the discrimination allegations predating those deadlines. *See, e.g., Williams v. Norfolk & W. Ry.*, 530 F.2d 539, 542 (4th Cir. 1975); *Jennings v. Univ. of N.C.*, 240 F. Supp. 2d 492, 500 (M.D.N.C. 2002).

I also reject defendant's argument that the hostile work environment claim under Title VII impermissibly exceeds the scope of the EEOC charges. As a prerequisite to bringing suit, an individual alleging discrimination in violation of Title VII must first file an administrative charge with the EEOC within a certain time of the unlawful act. *See* 42 U.S.C.A. § 2000e-5(b), (e)(1), (f)(1). Indeed, "the

- 23 -

administrative framework plays a substantial role in focusing the formal litigation it precedes" in that "[i]f 'the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred.'" *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005) (quoting *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995)). However, while "'the allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint,'" courts will construe them liberally. *Chacko,* 429 F.3d at 509 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996)).

I find that, although the plaintiffs' EEOC charges focused on the Chuck Morris incident, the fact that they alleged a "racially hostile work environment" and a "pattern and practice of systematic racial discrimination and racial harassment" makes the administrative charge sufficiently broad to encompass the current hostile work environment claim. These allegations of pervasive harassment ensure that an investigation of the EEOC charges would have uncovered the substance of the plaintiffs' current hostile work environment claim. *See Dennis*, 55 F.3d at 156 (explaining that claims raised under Title VII are procedurally barred only if the claims exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof). In reaching this conclusion, I also find

- 24 -

significant the fact that all three plaintiffs checked the "continuing action" box on their administrative charges. *See Chacko*, 429 F.3d at 511. Having rejected defendant's assertion that the racially hostile work environment claim exceeds the scope of the EEOC charges, I will now consider the merits under both § 1981 and Title VII.

Plaintiffs face a high hurdle in proving a hostile work environment claim, as the "the conduct must be 'extreme.'" *Karim v. Staples, Inc.*, 210 F. Supp. 2d 737, 752 (D. Md. 2002) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)). I find that the plaintiffs' hostile work environment claim fails as a matter of law.

In support of their hostile work environment claim, the plaintiffs have alleged thirty-eight separate incidents of racial harassment. The plaintiffs meet the first prong of the test, as the conduct alleged was undoubtedly unwelcome. To establish the second prong, the plaintiffs must show that the unwelcome incidents were based on race. This is easily established for thirteen of plaintiffs' allegations, namely the allegations that (1) an unidentified white employee called Martin a "nigger"; (2) operator Sherry Dean told Tams there never would be a black female supervisor; (3) Mike Brant used the word "nigger" in front of Thomas; (4) mechanic Burford commented that blacks were not good at operating machinery; (5) Chuck Morris used the word "nigger" several times over an open walkie talkie; (6) a racially offensive

cartoon was placed on Angela Hopkins door; (7) an Energizer Bunny toy was defaced to read "nigger"; (8) Robin Murkee taunted a Hispanic employee with a noose; (9) Cathy Dalrymple told Bernard Fauntleroy he needed to go back to the jungle and further mocked him because he was African-American; (10) employees Powell and Eppard taunted Tams in the locker room saying that she had an unpleasant odor because she was a black woman and also making fun of her hair, weight, and appearance; (11) Butch Wade auctioned Klu Klux Klan items simultaneously with Merck magazines; (12) Shiflett showed Thomas Klu Klux Klan material on the internet; and (13) that Reba Breeden was associated with the Ku Klux Klan. The mere fact that the plaintiffs did not personally witness and were not the target of some of these events is not conclusive. *See Boggs v. Die Fliedermaus, LLP*, 286 F. Supp. 2d 291, 298 (S.D.N.Y. 2003).

In addition to these thirteen allegations which clearly implicate race, I find that, viewing the evidence and reasonable inferences therefrom in the light most favorable to the plaintiffs, a reasonable fact-finder could also find that three more of plaintiffs' allegations were based on race. Namely, the incident where chocolate was smeared on Martin's pants, the incident where Tams' lunch was thrown away, and the incident where all of the buttons were cut off Tams' pants.

The use or reference to chocolate can indisputably be a racial slur, and thus I find that a reasonable inference of racial animus can be inferred from the fact that chocolate was smeared on Martins' clothing. *See,e.g., Boggs*, 286 F. Supp. 2d at 298 (finding that a reasonable jury could find that chocolate remarks create a racially hostile work environment even if made in a joking manner); *Purnell v. Maryland*, 330 F. Supp. 2d 551 (D. Md. 2004) (finding that a rational fact-finder could conclude that a chocolate bunny joke was based on racial animus).[6] Similarly, while there is no direct evidence of racial animus regarding the incidents where buttons were cut of Tams' pants and the lunch with her name on it was thrown away, I find that a rational jury could infer racial animus from these events considering the context in which they occurred. Both of these events occurred shortly after Tams' complaint to management regarding the racial harassment from Powell and Eppard and contemporaneous with the allegedly retaliatory treatment that Tams experienced from other white employees.

While these sixteen allegations could be found to be based on race and thus fulfill the second prong of the hostile work environment test, the same cannot be said

---

[6] While I find that a reasonable inference of racial animus can be inferred from this chocolate-smearing occurrence, I find that, contrary to plaintiffs' contention, there is insufficient evidence that the magazine shredding incident was so motivated even though it occurred within approximately the same time period.

- 27 -

for the remainder of the plaintiffs' thirty-eight allegations. An employee is harassed or otherwise discriminated against "because of" his or her race if, "but for" the employee's race, he or she would not have been the victim of the discrimination. *See Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 142 (4th Cir. 1996) (setting forth this "but for"causation standard in the context of Title VII sexual discrimination). The vast majority of the remaining allegations merely involve the defendant's efforts to ensure that proper documentation was received for employee absences, discipline employees for violations of the attendance policy, and reasonably accommodate employees in the workplace given medical restrictions and other constraints due to policies in place at Merck that were entirely unrelated to race. Aside from plaintiffs' conjecture and speculation, there is no evidence that race was the "but-for" cause of any of the remaining events.

To succeed in their claim of a racially hostile work environment, the plaintiffs must next show that the sixteen incidents that could rationally be found to be racially motivated were so severe or pervasive as to create a hostile work environment. Contrary to the plaintiffs' contentions, I find that the incidents complained of were not sufficiently severe or pervasive to state a claim.

The "severe or pervasive" element of a harassment claim has both a subjective and an objective component. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993).

- 28 -

To determine whether there was an objectively hostile environment at Merck's plant, the court must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with the plaintiff's performance; and what psychological harm resulted. *See Harris*, 510 U.S. at 21-23; *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 193 (4th Cir. 2000). This standard is a "demanding" one. *Faragher*, 524 U.S. at 788. Indeed, the plaintiffs are not guaranteed refinement and sophistication in their interactions at work. *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997). Rather, they are protected only from "harassing behavior that is so severe or pervasive as to render the workplace objectively hostile or abusive." *Id*.

The sixteen incidents at issue, even when viewed in the light most favorable to the plaintiffs, fail to rise to this level. While these incidents may be evidence of an unpleasant working environment, they do not permeate Merck "with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris*, 510 U.S. at 21) (internal quotation marks omitted). In reaching this conclusion, I find

it persuasive that the incidents were temporally diffuse and often were not directed at the plaintiffs.

The allegations include a lost lunch, an auction notice never seen at the Stonewall plant referring to Klu Klux Klan material, a rumor that coworker Reba Breeden might have ties to the Klu Klux Klan, and other isolated comments and actions by fellow employees that are spattered intermittently throughout more than a twenty-year period with significant gaps often present between occurrences. "That alone suggests the absence of a condition sufficiently pervasive to establish Title VII liability." *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (explaining that incidents of sexual harassment occurring intermittently over a seven-year period with gaps between incidents as long as a year likely insufficient to prove Title VII liability).

Furthermore, many of these sixteen incidents were not directed at the plaintiffs. The Fourth Circuit recently noted that "second-hand harassment, although relevant, [is] less objectionable than harassment directed at the plaintiff." *Jennings v. Univ. of N.C.*, 444 F.3d 255, 272 (4th Cir. 2006) (internal quotation marks omitted). Indeed, plaintiffs did not even witness several of the allegations included in their hostile work environment claim. This further weakens the plaintiffs' claim of a racially hostile work environment.

- 30 -

Admittedly, some of the allegations involved the use of the word "nigger," which is "[f]ar more than a mere offensive utterance" and constitutes "pure anathema to African-Americans." *Spriggs*, 242 F.3d at 185. However, while "[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a *supervisor* in the presence of his subordinates," the instances in which the word "nigger" was used in the instant case, with the exception of the Mike Brandt incident, did not involve supervisors at Merck. *Id.* (internal quotation marks omitted) (emphasis added). I find that as a matter of law, viewing the evidence in the light most favorable to the plaintiffs and considering the totality of the circumstances, the plaintiffs' allegations do not establish a sufficiently hostile environment on which to rest their claim.

The defendant further argues that the plaintiffs' hostile work environment claim also fails on the ground that liability cannot be imputed to Merck. Because I have concluded that the allegations comprising the hostile work environment claim were not sufficiently severe or pervasive to establish liability, the issue of whether liability can be imputed to Merck is not essential to the resolution of this claim. Nonetheless, I have considered the issue and agree with the defendant.

- 31 -

In order to hold an employer liable for acts of harassment by other employees or supervisors, there must be some basis in law for imputing those acts to the employer. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986); *Spriggs*, 242 F.3d at 186. When a tangible employment action, defined as an action at the hand of a supervisor causing an employee to suffer a "significant change in employment status," is at issue, such act becomes an act of the employer under agency principles. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). This type of employment action is not at issue here, because the plaintiffs have failed to set forth sufficient evidence that any of their allegations which could fit into this category were based on race. When dealing with claims that do not involve tangible employment actions, as in the instant case, liability is imputed to the employer where the employer knew or should have known about the harassment and failed to take effective action to stop it. *See Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003). Under this test, Merck escapes liability if it can demonstrate by a preponderance of the evidence that (1) it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior" and (2) the plaintiffs "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Burlington Indus.*, 524 U.S. at 765. I find that Merck has made this showing.

- 32 -

Admittedly, Diane McNeal, director of human resources, did state in her deposition that Merck does not have a written "zero tolerance policy for using racial slurs." (McNeal Dep. 102). However, she also explains that there was a discrimination policy in place during the relevant time period. Indeed, in the collective bargaining agreement governing the terms and conditions of the plaintiffs' employment, there is an anti-discrimination and harassment policy along with a grievance procedure. Additionally, a revised anti-discrimination policy was put in place at Merck in 1998. While this policy has not been negotiated with the union and is thus not a part of the collective bargaining agreement, all non-union employees were trained on this policy and it was posted on the bulletin board for all employees to see. Diane McNeal also noted during her deposition that there was a general understanding at the Stonewall plant that racial slurs could lead to termination. That this is true is demonstrated by the fact that when Mike Brandt used the word "nigger" in plaintiff Thomas' presence, Brandt asked Thomas to keep it quiet because if it were reported it would "probably . . . cost him his job." (Thomas Dep. 127.)

Not only was an anti-discrimination policy in place at Merck, when the plaintiffs chose to avail themselves of the policy's remedial measures, Merck took prompt action. For example, in response to the Chuck Morris incident, Merck gave Morris a five-day suspension. When Martin reported the Cathy Dalrymple incident,

- 33 -

Merck ultimately terminated Dalrymple for the racial harassment she imposed on coworker Fauntleroy. Similarly, when Tams reported harassment in the locker room by employees Powell and Eppard, Merck investigated the incident and disciplined the two employees such that the improper conduct never occurred again. Merck also investigated other reported allegations of harassment, but because the responsible parties could not be identified in these remaining instances, Merck was prevented from imposing discipline.

Additionally, despite the plaintiffs' knowledge of Merck's willingness to investigate and remedy alleged discrimination, the plaintiffs simply failed to report many of their allegations. Notably, Thomas failed to report the noose incident, the incident when Brandt used the word "nigger" in front of him, and the incident when Gary Shiflett showed him Ku Klux Klan memorabilia on the internet. Tams never reported the auction notice or the incident where buttons were allegedly cut from her pants and her lunch was allegedly thrown away. For these reasons, I find that, in addition to being defeated on the "severe or pervasive" prong, the plantiffs' hostile work environment also fails due to their inability to impute liability to Merck.

B

Next, the plaintiffs allege that Merck subjected them to disparate treatment racial discrimination in violation of Title VII and 42 U.S.C.A. § 1981. As was the case with the hostile work environment claim, the elements required to establish a prima facie case of disparate treatment are the same under Title VII and § 1981. *See Gairola v. Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985). Disparate treatment occurs when an employer intentionally treats members of a protected class less favorably than others with respect to the terms and conditions of employment because of their membership in the protected class. *See Carter v. Ball*, 33 F.3d 450, 456 n.7 (4th Cir. 1994). Absent direct evidence of discriminatory intent, such claims are appropriately analyzed under the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in the Title VII context.

Under *McDonnell Douglas*, the plaintiffs have the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 802. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. The plaintiff is then afforded the "'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.'" *Dennis v.*

- 35 -

*Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 646 (4th Cir. 2002) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). For the following reasons, I find that the plaintiffs' disparate treatment claims fail as a matter of law.

The allegations comprising the disparate treatment claim were also included in the hostile work environment claim and are thus set forth fully above. In short, the plaintiffs contend that the following allegations constitute discrimination: (1) Martin was no longer permitted to work flexible hours; (2) Martin was required to give up the relief operator position and take the newly created third shift; (3) Martin was denied training in blending; (4) Martin was improperly disciplined for absences, (5) Martin's job was improperly reposted while she was on sick leave; (6) health services and human resources contacted Martin and Thomas regarding work restrictions and doctor's excuses in a harassing manner; (7) Thomas was improperly deprived of overtime opportunities; (8) Thomas was temporarily denied funeral leave for the death of a non-family member; (9) Thomas was not permitted to work in the filling room because he had not completed the required "sterile room challenges"; (10) Thomas was denied training on the component prep side of building five; (11) Thomas' supervisor required him to return to work from the break room while other white employees were permitted to remain on break; (12) Thomas was given a written warning for having his safety goggles on top of his head; (13) Tams was temporarily

not permitted to work because of work restrictions after back surgery; (14) Tams was denied training on the "thermo former"; and (15) Tams was temporarily prevented from returning to her operator position on the packaging line after returning from another period of sick leave.

Merck first argues that some of the allegations of discrimination are time barred under both § 1981 and Title VII. As explained above, § 1981 has a four-year statute of limitations. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. at 375. Title VII has an even shorter limitations period. In Virginia, a plaintiff may only bring a claim under Title VII if the claim is based on events that occurred within 300 days of the plaintiff filing an EEOC complaint. *See* 42 U.S.C.A. § 2000e-5; *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 440 (4th Cir. 1998). Most of the allegations of disparate treatment occurred in 2001 or later, and thus the January 6, 2001, filing of the EEOC complaints and the December 3, 2001, filing of the instant action were clearly timely as to those events. However, the incident in which Tams was temporarily not permitted to work because of her restrictions after back surgery occurred in 1991; the incident where Tams was denied training on the "thermo former" occurred in 1994; the incident in which Martin was allegedly prevented from working flexible hours occurred in 1996; and the averaging-in of hours to which Thomas objects occurred sometime in 1997. All of these events are thus time-barred

- 37 -

under Title VII. All three are also time-barred under § 1981, with the possible exception of Thomas' averaging-in of hours complaint if the event occurred in December of 1997. Because a disparate treatment claim takes issue with discrete acts of discrimination, plaintiffs cannot rely on a continuing violations theory to cure the untimeliness. *See Williams v. Giant Food, Inc.*, 370 F.3d 423, 429 (4th Cir. 2004).

Merck next argues that the remainder of the plaintiffs' Title VII disparate treatment claim must fail because they failed to exhaust their administrative remedies. With the exception of Thomas' claims that he was improperly prevented from working in the filling room, denied training, and harassed by his supervisor, I agree.

As explained above, an individual alleging discrimination in violation of Title VII must first file an administrative complaint with the EEOC within a certain time of the unlawful act. *See* 42 U.S.C.A. § 2000e-5(b), (e)(1), (f)(1); *Chacko*, 429 F.3d at 508. The scope of a subsequent suit is limited to those claims made in the EEOC charge, claims that are reasonably related to those made in the EEOC charge, and any charges that would arise from an administrative investigation of the EEOC charge. *Id.* at 509. When a plaintiff alleges discrete acts of discrimination, as is the case in a disparate treatment claim, the plaintiff is required under Title VII to file an EEOC charge for each such discrete act. *See Harris v. Rumsfeld*, 428 F. Supp. 2d 460, 470

(E.D. Va. 2006) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

The plaintiffs' original EEOC charges simply address the Chuck Morris incident and allege a general pattern and practice of discrimination. Because these EEOC complaints filed in 2001 did not include any of the disparate treatment claims now alleged, the plaintiffs' Title VII disparate treatment claim must fail unless they filed additional charges with the EEOC setting forth these allegations. Only Thomas filed an additional charge with the EEOC, addressing his allegations that he was improperly prevented from working in the filling room, denied training, and harassed by his supervisor. Thus, only these claims of disparate treatment under Title VII survive, and the rest must be dismissed for failure to exhaust.

While under the plaintiffs' Title VII theory of disparate treatment all but a few of Thomas' allegations fail for failure to exhaust, § 1981 carries no exhaustion requirement. *See Sledge v. J. P. Stevens & Co.*, 585 F.2d 625, 639 (4th Cir. 1978). Thus, all of the plaintiffs disparate treatment allegations, other than those which are time-barred, survive on the § 1981 cause of action and I must proceed to consider the merits of these claims. However, for the following reasons, I find that the plaintiffs disparate treatment claims still fail under the *McDonnell Douglas* framework.

- 39 -

The four elements of a prima facie case of disparate treatment discrimination are: (1) the plaintiff is a member of a protected class, (2) the plaintiff is qualified for the position, (3) the plaintiff suffered adverse employment action, and (4) an employee not in the protected class replaced the plaintiff or was treated more favorably. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An adverse employment action need not be an ultimate employment decision such as termination, but to adequately plead the adverse employment action element, the plaintiffs must allege that they have been subjected to acts that adversely affect the terms, conditions, or benefits of their employment. *Id.* at 375-76. As explained below, the vast majority of the plaintiffs' timely allegations simply fail to make this showing. The only one that a rational juror might find to constitute an adverse employment action, namely Martin's suspension for absences, ultimately fails in the later stages of the *McDonnell Douglas* framework.

The plaintiffs' allegations that Martin was required to give up the relief operator position and take the newly created third shift, that Thomas was moved to another position until he completed the required "sterile room challenges," and that Tams was temporarily prevented from returning to her operator position on the packaging line after returning from sick leave were simply shift changes and are thus not adverse employment actions. The mere fact that a new job assignment is less

- 40 -

appealing to the employee does not constitute adverse employment action. *James,* 368 F.3d at 376. To constitute an adverse employment action, a reassignment must have some "'significant detrimental'" effect such as "'decrease in compensation, job title, level of responsibility, or opportunity for promotion.'" *James*, 368 F.3d. at 376 (quoting *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999)). Indeed, "reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id*. (quoting *Boone*, 178 F.3d at 257). As none of these three job reassignments had any detrimental effect on pay, job title, responsibility, or promotion opportunities, nor any other significant negative consequence, they do not support a discrimination claim. Thomas' contention that he lost overtime opportunities due to his temporary reassignment is simply not supported by the record, which demonstrates that overtime work was available to Thomas during this time but he elected not to do it.

I find that the incidents where Martin's job was improperly reposted while she was on leave and where Thomas was told to leave the break room are likewise not significant enough to constitute adverse employment actions. The record is clear that regardless of whether Martin's position was reposted, she returned to the same shift after surgery and thus she was not adversely effected. With respect to the time that

- 41 -

Thomas was told to leave the break room, allowing such an incident to constitute an adverse employment action would result in transforming "every trivial personnel action" that an employee experiences into "the basis of a discrimination suit." *Peary v. Goss*, 365 F. Supp. 2d 713, 723 (E.D.Va. 2005).

The incident in which Thomas was given a written warning for having his safety goggles on top of his head is slightly more significant than the break room incident, but it too ultimately fails to demonstrate an adverse employment action. The "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies." *Von Gunten*, 243 F.3d at 869. The disciplinary memorandum did not lead to a termination or suspension, and I fail to see how Merck's demand that Thomas comply with safety policy adversely affected his employment, especially when the discipline was the result of his own conduct. *See id.*

Next, all three plaintiffs allege that they were once denied training upon request. As explained above, Martin's allegation in this regard is time-barred. In any event, I find that the denial of a single request for training does not constitute an adverse employment action. *See id.* (finding denial of requests to attend seminars was not an adverse employment action); *Chika v. Planning Research Corp.*, 179 F. Supp. 2d 575, 584-85 (D. Md. 2002) (holding that plaintiff failed to establish how the denial

- 42 -

of two training requests altered the terms and conditions of his employment where he was afforded numerous training opportunities). There is no evidence in the record indicating that the training denials in the instant case altered the terms and conditions of the plaintiffs' employment.

Thomas and Martin also both take issue with the actions of health services and human resources, but I find that these departments' attempts to obtain proper documentation and remain current with work restrictions are simply not adverse employment actions either. In *Von Gunten*, the plaintiff made similar complaints that her employer hyper-scrutinized her sick leave and required unnecessary documentation. *Von Gunten*, 243 F.3d at 869. The Fourth Circuit explained that they "fail[ed] to see how [the employer's] demands that [the employee] comply with sick leave policy adversely affected her employment." *Id*. This same rationale applies in the instant case.

The allegation that Thomas' overtime hours were improperly averaged in occurred in 1997, and thus it is likely time-barred. However, even if this event occurred in December of 1997 and thus narrowly satisfies the four-year statute of limitations applicable to claims brought under § 1981, I find that it was not an adverse employment action. At Merck, overtime is awarded based on the number of overtime hours an employee has already worked, with overtime opportunities being

- 43 -

given to employees with the lowest number of hours. When Thomas returned from sick leave in or about 1997, he had a low number of overtime hours. According to Thomas, white employees felt it unfair that Thomas be awarded overtime hours as a result of being out sick and thus requested that Thomas' hours be averaged in with other employees. Thomas explained in his deposition "that most time, [the collective bargaining agreement] said they shouldn't be allowed to [average in an employee's hours when he has been] off sick." (Thomas Dep. 47). Nonetheless, management agreed to average in Thomas' hours, and thus Thomas filed a grievance with the Union.

Admittedly, lost overtime opportunities may constitute an adverse employment action. *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (finding adverse employment action when, among other things, the plaintiff was "'totally blackballed' from overtime"). However, I find that this incident, although it did indirectly deprive Thomas of some compensation, does not rise to the level of an adverse employment action. He was not completely deprived of overtime, but merely put on par with his fellow employees who had not been absent from work. Moreover, Thomas ultimately decided to accept the averaging and not challenge it beyond the second step in the grievance process upon the advice of the union.

Lastly, plaintiff Martin contends that she was improperly disciplined for absences and that this discipline constituted an adverse employment action. Martin does not deny that she was absent for a significant number of days, which would warrant discipline. Rather, she argues that she had no way of knowing where she stood on the discipline ladder as it pertained to absenteeism and was not informed that she was in violation of any attendance policy during the time there was a glitch in the AMS system. After the glitch was corrected, Martin received a three-day and a one-day suspension for absences. Because Martin was deprived of pay on both instances, I find that a rational juror could conclude that this was an adverse employment action. *See, e.g., Burlington Indus.*, 524 U.S. at 749. However, this claim of disparate treatment ultimately fails in the later stages of the *McDonnell Douglas* analysis. These suspensions were the result of Martin's violation of Merck's attendance policy, and thus the defendant has successfully supplied a legitimate, non-discriminatory reason for the employment action in question. *See McDonnell Douglas*, 411 U.S. at 802. Martin has failed to then "'prove by a preponderance of the evidence that the legitimate reason[] offered by the defendant [was] not its true reason[], but [was] pretext for discrimination.'" *Dennis*, 290 F.3d at 646 (quoting *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 253).

- 45 -

Indeed, Martin was not the only employee affected by the glitch. After the glitch was corrected, some of the employees who were affected had not accrued enough absences to warrant discipline, and others were permitted to retroactively use vacation or personal days rather than sick days in order to avoid discipline. It was because Martin had no remaining vacation or personal days that she was ultimately reprimanded. Therefore, I find that Martin has failed to meet her burden under *McDonnell Douglas* and must dismiss this disparate treatment allegation as well.

## C

Lastly, the plaintiffs argue that they were subject to both specific instances of retaliation and a retaliatory hostile work environment generally as a result of filing their EEOC charges in June 2000, initiating the instant lawsuit in December 2001, and raising various other allegations of discrimination during the pendency of this case. Specifically, the plaintiffs contend that the following incidents constituted retaliation: (1) Martin's removal from the relief operator position; (2) Martin's discipline under AMS; (3) the reposting of Martin's position while she was out on leave; (4) the fact that "lawsuit" was written next to Martin's name on an employee list; (5) the temporary removal of Thomas from the filling room due to his failure to participate in the sterile room challenges; (6) the discipline Thomas received for not wearing his safety goggles; (7) Merck's failure to immediately return Tams to the

- 46 -

packaging line in building five; (8) the harassment Tams received from employees Powell and Eppard; (9) the cold-shoulder behavior exhibited by other employees after Tams reported the harassment by Powell and Eppard; and (10) the alleged harassment from Merck's health services and human resources.

To establish their prima facie case of retaliation, the plaintiffs must show that (1) they engaged in activity protected under Title VII; (2) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment; and (3) the protected activity and the adverse action were causally connected. *See Tinsley*, 155 F.3d at 443. In its recent decision in *Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006), the Supreme Court made clear that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id*. at 2414. Therefore, a plaintiff need not establish an "adverse employment action" as that term is used in the context of the anti-discrimination provision to satisfy the second prong of the prima facie case for a claim based on the anti-retaliation provision. *Id*. at 2419. The Court explained that a plaintiff must instead "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 2415 (internal quotation

- 47 -

marks omitted). Nonetheless, trivial incidents such as "petty slights, minor annoyances, and simple lack of good manners" are still insufficient to support a claim of retaliation even under this newly elaborated standard. *Burlington N. & Santa Fe Ry.*, 126 S. Ct. at 2415.

If the plaintiffs can make out a prima facie case of retaliation, then the burden shifts to the defendant employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002). If the defendant succeeds in doing so, the plaintiff must then demonstrate that the asserted reason is merely pretext for retaliation. *Id.*

The plaintiffs have established the first prong of the prima facie case, because they filed charges with the EEOC and initiated the instant lawsuit. However, as explained below, each of their allegations of retaliation ultimately fails either on the second or third prong of the prima facie case. Because the plaintiffs cannot establish a prima facie case of retaliation, I need not analyze the non-retaliatory reasons proffered by the defendant.

Martin's removal from the relief operator position fails to support a prima facie case of retaliation because it would not dissuade a reasonable worker from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe. Ry.*, 126 S.

- 48 -

Ct. at 2415. While an allegation of retaliation need not be an adverse employment action relating to the terms or conditions of employment in order to satisfy the second prong of the prima facie case, it nonetheless must be materially adverse. *Id*. Here, when Martin was removed from the relief operator position, her duties remained the same. The only difference was the hours of her shift. While she was no longer permitted to work a straight first shift, she was given the choice to either rotate between the first and second shifts or work solely on the newly-created third shift. While "[a] schedule change . . . may matter enormously to a young mother with school age children," such a minor adjustment "make[s] little difference to many workers." *Id*. Martin argues that the rotating shift was unacceptable for her because someone needed to be home at all times to take care of "[her] little dog," but the third shift was available to her and allowed for this accommodation. (Martin Dep. 147.) Overall, I find that the minor inconvenience Martin suffered as a result of being removed from her relief operator position fails to meet the materiality requirement.

Because I have already found that the discipline Martin received under AMS constituted an adverse employment action, I must also find that it satisfies the easier materiality showing required in a retaliation claim. However, Martin cannot show that this discipline, which occurred in 2004, was causally connected to any protected activity. This event occurred nearly three years after the filing of the instant lawsuit,

- 49 -

which is the protected activity most immediately preceding it. "A lengthy time lapse between the employer becoming aware of protected EEO activity and the alleged adverse employment action negates the inference that a causal connection exists between them." *Orenge v. Veneman,* 218 F. Supp. 2d 758, 763 (D. Md. 2002) (citing *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145 F.3d 653, 657 (4th Cir. 1998)). Accordingly, I find that this allegation does not satisfy the third prong and thus fails to support a prima facie case of retaliation.

I find that the reposting of Martin's position while she wacds out on leave and the fact that "lawsuit" was written next to Martin's name on an employee list were not materially adverse and thus cannot support a claim of retaliation. If, as Martin alleges, her job was reposted while she was on leave for her rotator cuff surgery, it was insufficient to prove retaliation because the evidence is clear that she returned to the same position. While Martin's supervisors clearly did not act with the appropriate level of professionalism when they noted on an employee list that she had filed a lawsuit, I must also find that this incident is not actionable. At most it shows that Martin's supervisors were aware of the protected activity, but it does not demonstrate a materially adverse action rising to the level of retaliation.

Similarly, I find that the temporary removal of Thomas from the filling room and the discipline he received for not wearing his safety goggles fail to meet the

requisite threshold of materiality. It is clear from the record that Thomas was only removed from the filling room for five months, until he could complete the mandatory sterile challenge. While Thomas alleges that he was treated differently than white employees in this respect, he concedes that after 2002, when Merck began enforcing the policy that employees working in the filling room must complete at least one sterile challenge per year, no other filling room employee who had missed the required challenges was permitted in the filling room. Thomas complains that two trainees and department head David Hunter went into the filling room without participating in sterile challenges, but Merck's policy clearly states that the sterile-challenge requirement only applies to employees who "routinely work" in the filling room and that "[n]ew employees may work and train in the [filling room] . . . prior to participating in a sterile media challenge" as long as they participate in the next scheduled challenge and one challenge annually thereafter. (Def. Mot. Summ. J. Thomas, Ex. M.) Given the temporary nature and logical explanation for Thomas' exclusion from the filling room, I find that this exclusion from the filling room would not "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe. Ry.*, 126 S.Ct. at 2415 (internal quotation marks omitted). Likewise, I find that the mild discipline Thomas received for not

wearing his safety goggles in clear violation of Merck's policy would also not dissuade a reasonable employee from engaging in a protected activity.

Moreover, even if these two incidents met the materiality requirement, there is no evidence of a causal connection with a protected activity. Thomas was precluded from working in the filling room in March of 2003, which is well over a year after the plaintiffs filed the instant lawsuit in December of 2001, the nearest preceding protected activity. Similarly, Thomas was disciplined for not wearing his goggles sometime in 2005, which was at least a year and five months after he filed an EEOC charge regarding his removal from the filling room in July of 2003, the protected activity most immediately preceding the goggles discipline. Therefore, because neither of these allegations of retaliation occurred within close temporal proximity to any protected activity, the plaintiffs cannot establish the requisite causal connection as a matter of law. *See King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) (explaining that although there was a sufficient inference of causation based on the fact that the termination occurred only two months after the protected activity, the lapse of even just two months between the protected activity and the adverse action is sufficiently long so as to weaken significantly the inference of causation and may have defeated the prima facie case had it not been for the unique context of the particular employment situation at issue); *Bullard v. Panasonic Corp.*, 418 F. Supp.

- 52 -

2d 802, 814 (E.D. Va. 2006) (explaining that to establish a causal connection based on circumstantial evidence the plaintiff must show that the temporal proximity between the employer's knowledge of the protected activity and the adverse action was "'very close,'" and holding that the requisite temporal proximity was lacking when "well over four months lapsed").

I find Tams' claim that Merck's failure to immediately return her to the packaging line in building five upon her return from leave lacks the requisite materiality and thus fails the second prong of a claim for retaliation. Tams' supervisor David Secrist explains, and Tams does not dispute, that during the time in 2001 when Tams was on leave, Merck was in the process of reducing the headcount in the packaging area. Thus, when Tams returned to work in May of 2001, there was no longer a spot for her on the packaging line. Tams admits that all of the employees on the packaging line had more seniority than she, but argues that she should have been allowed to bump employee Charlotte Chittum, whom Tams believed was out on long-term disability and was rumored to be near retirement. Merck informed Tams that Chittum was not actually on long-term disability at that time and had not officially retired, but assured her that it had no intention of ending Tams' employment. Thereafter, Tams was placed temporarily in the encapsulating area,

where she could perform with her work restrictions, until she was eventually placed back on the packaging line.

While the reassignment of duties can certainly constitute retaliatory discrimination, it is "not automatically actionable." *Burlington N. & Santa Fe Ry.*, 126 S. Ct. at 2416. "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position.'" *Id*. Here, Tams' reassignment was temporary, was in the same building, and was in the same category of "pharmaceutical processor." (Tams Dep. 109.) There is also no evidence that the tasks involved in this new area were more arduous or less desirable. While Tams suffered stress during the brief time period that Merck was finding an available position for her, she was reassured that she would be accommodated and thus the stress was self-induced. Therefore, I find that this reassignment was not materially adverse. Furthermore, this incident occurred in May of 2001, four months after the filing of the EEOC complaint and prior to any other protected activity engaged in by Tams, and thus likely fails on the "causal connection" prong as well. *See Bullard*, 418 F. Supp. 2d at 814.

Next, while retaliatory harassment can constitute an adverse action for purposes of making out a prima facie case of retaliation, I find that the harassment

Tams received from employees Powell and Eppard was not sufficiently severe or pervasive to rise to this level. Secondly, since Merck took prompt responsive action to this harassment by suspending both Powell and Eppard, this harassment cannot be imputed to Merck such that it can be held liable. *See Morse v. Giant Food, Inc.*, No. DKC 2003-0087, 2005 U.S. Dist. LEXIS 567, *26 (D. Md. Jan. 5, 2005) (citing *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003)). Moreover, there is no causal connection between any of the protected activities and this harassment because there is no evidence that Powell and Eppard were aware that Tams engaged in any protective activity. *See Morse*, 2005 U.S. Dist LEXIS 567 at *27 n.6 (finding no causal connection where there is no evidence to suggest coworkers were aware of protected activity).

Tams also claims that the "cold shoulder" treatment she received from fellow employees in the locker room constituted retaliation. Tams alleges that this occurred in response to the complaint she lodged with Merck regarding the harassment from Powell and Eppard, and it is established in this circuit that filing an internal complaint constitutes a protected activity. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). Viewing the evidence in the light most favorable to Tams, it also appears that there is sufficient evidence of a causal connection given that (1) her fellow employees would surely have known of the suspension of Powell

- 55 -

and Eppard and (2) this conduct occurred right after she lodged the complaint. Nonetheless, these actions by her coworkers simply fail the "materially adverse" prong of retaliation. While being avoided and ignored by fellow employees is undoubtedly uncomfortable, I find that it is within the category of "petty slights and minor annoyances" and would not "dissuade[] a reasonable worker from" engaging in a protected activity. *Burlington N. & Santa Fe Ry.*, 126 S. Ct. at 2415.

Lastly, I must analyze the alleged harassment that Martin and Thomas received from Merck's health services and human resources, which plaintiffs contend is the most egregious of their retaliation allegations. I find that this alleged harassment would not dissuade a reasonable worker from filing a charge of discrimination and is thus not materially adverse. *See id*. Martin and Thomas point to a few isolated incidents in which Merck contacted them regarding doctors' excuses, work restrictions, and entitlement to short-term disability benefits. Even if these contacts from Merck were slightly out of the ordinary, they were the result of Merck's need for adequate documentation and simply do not rise to the level of an actionable claim.

As a final matter, I reject the plaintiffs' contention that all of these allegations of retaliation taken together create a retaliatory hostile work environment. To succeed on this claim, the alleged hostility must be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment."

*Meritor*, 477 U.S. at 67. The plaintiffs' allegations fall far short of this difficult standard.


## IV

I find that this is an appropriate case for summary judgment because there is no genuine issue of material fact. The plaintiffs have failed to produce evidence sufficient to support their claims of a hostile work environment, disparate treatment, and retaliation. Therefore, for the reasons stated above, I will grant summary judgment in favor of the defendant. A separate final judgment consistent with this opinion will be entered.

DATED: August 28, 2006

/s/ JAMES P. JONES
Chief United States District Judge

Case 5:05-cv-00028-JPJ   Document 78   Filed 08/28/06   Page 57 of 57   Pageid#: 1316